UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

- - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

       Plaintiff,

    v.

CHARLES RICHARD COPPESS,

       Defendant.

_____/

No.    1:08-CR-242

Hon. Robert Holmes Bell
United States District Judge

## PLEA AGREEMENT

This constitutes the plea agreement between Charles Richard Coppess and the United States Attorney's Office for the Western District of Michigan.  The terms of the agreement are as follows:

1.    <u>The Defendant Agrees to Plead Guilty.</u>    The Defendant agrees to plead guilty to Count 1 of the Indictment.  Count 1 charges the Defendant with Conspiracy to Commit Securities Fraud, Wire Fraud and Mail Fraud, in violation of Title 18, United States Code, Section 371.

2.    <u>The Defendant Understands the Crime.</u>    In order for the Defendant to be guilty of violating Title 18, United States Code, Section 371, the following must be true:

    a.    The defendant and at least one other person made an agreement to commit crimes cognizable in courts of the United States;

    b.    The defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further its unlawful purpose; and,

c.    One of the conspirators during the existence of the conspiracy knowingly committed at least one of the overt acts described in the indictment, in order to accomplish some object or purpose of the conspiracy.

The Defendant is pleading guilty because he is guilty of the charge described above.

3.    The Defendant Understands the Penalty.    The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 371 is the following: 5 years imprisonment; a 3-year period of supervised release; a fine of $250,000, or twice the gross gain or gross loss resulting from the offense, whichever is greater; and a mandatory special assessment of $100.  The Defendant agrees to pay the special assessment at or before the time of sentencing unless the Defendant affirmatively demonstrates to the Court that he lacks the ability to pay.

4.    Restitution.    The Defendant understands that he will be required to pay full restitution to the victims of the offense.

5.    Factual Basis of Guilt.    The Defendant and the U.S. Attorney's Office agree and stipulate to the following statement of facts which need not be proven at the time of the plea or sentencing:

a.    In or around February, 2005, at a "pitch" meeting in the Lansing, Michigan area, Eric and Jay Merkle ("the Merkles") solicited Defendant Charles Richard Coppess ("Coppess") and several other individuals to invest in supposed oil and gas exploration ventures.  The Merkles promised a return of 3% per month, and represented that they could pay this high rate because they already had 57 wells

2

producing oil and gas in the United States.  The Merkles' "pitch" included a video slide show with pictures of wells, maps, graphs, and financial projections.  Coppess invested a substantial sum of his own money in the ventures, as did the other attendees, who were family or close friends of Coppess.

       b.     On June 26, 2005, the Merkles hired Coppess to raise capital for their investment ventures, using his personal and professional contacts in the Western District of Michigan and elsewhere.  These ventures included Southwest Energy, Longhorn Energy and other supposedly oil-and-gas related companies they controlled.  One of Coppess' primary tasks was to facilitate the transfer of investors' retirement funds from Individual Retirement Accounts ("IRA"s), a process he understood because of his background as a financial advisor and salesman of life insurance and mutual funds.  According to the terms of his contract, Coppess received an annual salary of $100,000 for his services.

       c.     The Merkles told Coppess the money he raised from investors would be used to finance domestic oil and gas exploration, primarily in Oklahoma and Texas.  Coppess made similar representations to his investors, based on what the Merkles had told him.

       d.     In or around July, 2005, the Merkles invited Coppess and the investment group from the February 2005 "pitch" meeting to an expensive dinner at the Sheraton Hotel in Lansing, Michigan.  The Merkles told the group they wanted to reward them for being "great investors," and that they had a plan to help the group share in their success.  To this end, the Merkles suggested the group form their own

3

investment company to raise money for Merkle ventures.  With the assistance of a lawyer recommended by the Merkles, the group incorporated "Rainco Investments" for this purpose.

        e.    Around the same time, the Merkles advised Coppess and the other Rainco principals to invest the money they raised in Platinum Business Industries ("PBI"); a new Merkle venture.  The Merkles promised Coppess that PBI would pay high yields for short-term investments, and that it was a "safe" place to park the investors' money.  Coppess raised money for PBI using the same promises, including $70,000 from an 85-year old woman on July 16, 2005.

        f.    In or around March, 2006, Coppess became concerned when the Merkles were unable to make payments to investors in earlier oil and gas ventures. Coppess approached Eric Merkle, who told him the Rainco investors' money was all "tied up in a larger investment pool overseas," or words to that effect.  Coppess continued to raise money from investors after this time, but did not tell them that their money might be sent overseas.  Coppess deliberately concealed this fact because he knew it might dissuade investors from investing.

        g.    Around the same time, Eric Merkle admitted to Coppess that he had been using money invested in PBI to pay earlier PBI investors.  In particular, Eric Merkle referred to a "hardship list" he and Jay Merkle had compiled, comprised of investors who had threatened to sue or complain to law enforcement authorities.  Eric Merkle admitted new PBI investor funds were being used to pay "earnings," and/or principal to these investors to "keep things quiet."  Coppess understood from his financial background that using new investor funds to pay "earnings" to previous

investors constituted an illegal "Ponzi scheme."  In describing the PBI investment to new investors after this time, however, Coppess deliberately omitted what Eric Merkle had told him, because he knew it would dissuade investment.

h.      Between March and May, 2006, Eric Merkle told Coppess he had found a "buyer" for the Merkles' supposed oil and gas assets, and that the money from the sale would be used to pay out the PBI and Rainco investors.  According to Eric Merkle, the buyer had four hundred million dollars ($400,000,000) "tied up" in Nigeria, but needed additional money to pay for fees and costs associated with transferring the money to the United States.

i.      In May, 2006, Eric Merkle approached the Rainco principals for a $28,000 short-term loan to "free up" the supposed Nigerian money.  On June 5, 2006, Rainco lent $28,000 to Eric and Jay Merkle, who promised to repay the loan in one month with 20% interest.  Within weeks of this loan, Eric Merkle informed Coppess and the other Rainco principals that the transfer of money from Nigeria was being held up by the Bank of China, the Federal Reserve, the IRS, the Department of Homeland Security, and other assorted problems.  The Merkles defaulted on repayment of the $28,000 loan.

j.      In or around June, 2006, Coppess and the other Rainco principals met to discuss their investments with the Merkles.  The entire group, including Coppess, agreed that they believed they had been defrauded, and agreed not to raise any further funds from investors.

k.      Despite this consensus, Coppess continued to raise money for the Merkles on his own, because he believed that cutting off ties with them would make it

5

impossible to recoup his own losses or those of his clients. For example, On October 2, 2006, Coppess solicited a $15,000 investment in PBI from an investor. Coppess told the investor it was a "good investment," and carried little risk. Coppess did not tell the investor that Rainco had stopped raising money for the Merkles, that the money would likely be wired overseas, or that it might be used to pay previous investors. He deliberately withheld these facts because he knew the investor would not invest if he knew them. Coppess turned the money over to the Merkles as they had requested, in the hope that his own investments and those of his clients might eventually be repaid.

l.      On numerous occasions after March, 2006, Coppess communicated with investors he had steered toward PBI and other Merkle ventures. When the investors asked why they had not been paid their promised earnings and could not get back their principal, Coppess told them their money was being held up by interference from the Department of Homeland Security and other government agencies, as well as the actions of various foreign banks, governments and officials. As instructed by Eric Merkle, Coppess also told investors that cooperating with the Federal Bureau of Investigation would delay their repayment. Coppess did not believe these representations to be true, but made them on behalf of the Merkles in hopes of delaying lawsuits or law enforcement action until some means of repayment could be found.

6.   <u>Cooperation.</u>        The Defendant agrees to fully cooperate with the Federal Bureau of Investigation, the U.S. Postal Inspection Service, the U.S. Attorney's Office, and any other law enforcement agency in their investigation of the charges contained in this Indictment as well as the investigation of crimes over which they have actual or apparent jurisdiction. The Defendant's cooperation will consist of all steps

6

needed to uncover and prosecute such crimes, including, but not limited to, providing investigators with a full, complete and truthful statement concerning the Defendant's knowledge of any and all criminal activity of which he is aware; truthfully answering investigators' questions; meeting with prosecutors before testifying; truthfully testifying before grand juries and in any court proceedings; and providing all relevant tangible evidence in the Defendant's possession or under the Defendant's control, including, but not limited to, objects, documents, and photographs. The Defendant's obligation to cooperate under this paragraph is an affirmative one and includes the obligation to voluntarily come forward with any and all information which the Defendant should reasonably know will assist in the investigation of other criminal activity. The Defendant will not commit any criminal offense during the course of his cooperation with the United States. The Defendant will submit to polygraph examination upon request. The Defendant's obligation under this paragraph is a continuing one, and shall continue after sentencing until all investigations and prosecutions in which the Defendant's cooperation is deemed relevant by the U.S. Attorney's Office have been completed.

      7.   <u>The United States Attorney's Office Agrees</u>.

        a.   <u>Dismissal of Other Counts</u>.   The U.S. Attorney's Office agrees to move to dismiss the remaining counts of the Indictment against the Defendant at the time of sentencing. The Defendant understands, however, that in determining the sentence the Court may consider the dismissed counts in determining the applicable Sentencing Guidelines range, where the sentence should fall within the applicable guidelines range, and the propriety of any departure from the calculated guidelines

range.  By this agreement the Defendant does not concede that an increased sentence or an upward departure is, in fact, warranted.

      b.    <u>Acceptance of Responsibility.</u>    The U.S. Attorney's Office agrees not to oppose the Defendant's request for a two-level reduction of his offense level for acceptance of responsibility under Section 3E1.1(a) of the Sentencing Guidelines. However, the U.S. Attorney's Office reserves the right to object to Defendant's request if it subsequently learns of conduct by the Defendant that is inconsistent with the criteria set forth in the Commentary to Section 3E1.1.  Should the Court grant a two-level reduction as provided herein, the government will move the Court to grant an additional one-level reduction if the adjusted offense level is 16 or greater pursuant to Section 3E1.1(b).

      c.    <u>Protection for Proffered Statements.</u>    The U.S. Attorney's Office agrees that information provided by the Defendant through the Defendant's proffers, and any information provided pursuant to the Defendant's promise to cooperate as described in this agreement, will not be used by the Government to enhance the Defendant's sentence, in accordance with Sentencing Guidelines §1B1.8, and according to the terms of the written agreement entered into between the parties immediately prior to the proffers.  It is expressly understood, however, that such information may be used by the Government at sentencing if the Defendant takes a position at sentencing that contradicts information provided by the Defendant pursuant to this agreement or any proffer agreement.

    d.   <u>Possibility of Sentence Reduction Motions.</u>   The U.S. Attorney's Office will decide whether to file a motion for departure or reduction of sentence pursuant to Sentencing Guidelines §5K1.1 or Rule 35(b) of the Federal Rules of Criminal Procedure.  The Defendant fully understands that such a motion may be made pursuant to law if, and only if, the Defendant fully cooperates with the Government and materially and substantially assists the Government in the investigation or prosecution of others.  The determination of whether the Defendant has provided substantial assistance to the United States, or to designated state or local law enforcement authorities, will be made in the sole discretion of the U.S. Attorney's Office.  In determining whether to file a § 5K1.1 or Rule 35(b) motion, the United States Attorney's Office will take into consideration the benefit already conferred upon the Defendant in paragraph 7(a) of this agreement.  The Defendant fully understands that this paragraph is not a promise by the Government to file such a motion.  Additionally, the Defendant understands that, even if such a motion were filed, the Court has discretion to grant or deny the motion.  Furthermore, if the Court were to grant the motion, the Court has discretion to determine how much of a sentence reduction the Defendant will receive based upon the nature and extent of the Defendant's assistance.  The Defendant acknowledges and agrees that he may not appeal the Court's exercise of its discretion in granting or denying a motion for departure or reduction of sentence, if such a motion is made.

    8.   <u>The Sentencing Guidelines.</u>   The Defendant understands that, although the United States Sentencing Guidelines (the "Guidelines") are not mandatory, the Court must consult the Guidelines and take them into account when sentencing the

9

Defendant.  The Defendant understands that the Court, with the aid of the presentence report, will determine the facts and calculations relevant to sentencing.  The Defendant understands that the Defendant and the Defendant's attorney will have the opportunity to review the presentence report and to make objections, suggestions, and recommendations concerning the calculation of the Guideline range and the sentence to be imposed.  The Defendant further understands that the Court shall make the final determination of the Guideline range that applies in this case, and may impose a sentence within, above, or below the Guideline range, subject to the statutory maximum penalties described elsewhere in this Agreement.  The Defendant further understands that disagreement with the Guideline range or sentence shall not constitute a basis for withdrawal of the plea.

9.    <u>There is No Agreement About the Final Sentencing Guidelines Range</u>. The Defendant and the U.S. Attorney's Office have no agreement as to the applicable Sentencing Guidelines factors or the appropriate guideline range.  Both parties reserve the right to seek any sentence within the statutory maximum, and to argue for any criminal history category and score, offense level, specific offense characteristics, adjustments and departures.

10.    <u>Waiver of Constitutional Rights</u>.    By pleading guilty, the Defendant gives up the right to persist in a plea of not guilty and the right to a speedy and public trial by jury or by the Court.  As a result of the Defendant's guilty plea[s], there will be no trial. At any trial, whether by jury or by the Court, the Defendant would have had the following rights:

a. The right to the assistance of counsel, including, if the Defendant could not afford an attorney, the right to have the Court appoint an attorney to represent the Defendant.

b. The right to be presumed innocent and to have the burden of proof placed on the Government to prove the Defendant guilty beyond a reasonable doubt.

c. The right to confront and cross-examine witnesses against the Defendant.

d. The right, if the Defendant wished, to testify on the Defendant's own behalf and present evidence in opposition to the charges, including the right to call witnesses and to subpoena those witnesses to testify.

e. The right not to be compelled to testify, and, if the Defendant chose not to testify or present evidence, to have that choice not be used against the Defendant.

By pleading guilty, the Defendant also gives up any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

11.   <u>The Court is not a Party to this Agreement</u>.    The Defendant understands that the Court is not a party to this agreement and is under no obligation to accept any recommendation by the U.S. Attorney's Office or the parties regarding the sentence to be imposed.  The Defendant further understands that, even if the Court ignores such a recommendation or imposes any sentence up to the maximum established by statute, the Defendant cannot, for that reason, withdraw his guilty plea, and he will remain bound to fulfill all his obligations under this agreement.  The Defendant understands that no one – not the prosecutor, the Defendant's attorney, or the Court –  can make a

11

binding prediction or promise regarding the sentence the Defendant will receive, except that it will be within the statutory maximum.

12.    This Agreement is Limited to the Parties.    This agreement is limited to the U.S. Attorney's Office for the Western District of Michigan, and cannot bind any other federal, state or local prosecuting, administrative or regulatory authority.  This agreement applies only to crimes committed by the Defendant.  This agreement does not apply to or preclude any past, present, or future forfeiture or civil actions.

13.    Consequences of Breach.    If the Defendant breaches any provision of this agreement, including any promise of cooperation, whether before or after sentencing, the United States shall have the right to terminate this agreement, or deny any or all benefits to which the Defendant would otherwise be entitled under the terms of this agreement.  In the event that the United States elects to terminate this agreement, the agreement shall be considered null and void, and the parties shall return to the same position they were in prior to the execution of this agreement, as though no agreement ever existed.  In such an event, the Defendant shall remain liable for prosecution on all original charges, and the United States shall be free to bring such additional charges as the law and facts warrant.  The Defendant further agrees to waive and forever give up his right to raise any claim that such a prosecution is time-barred if the prosecution is brought within one (1) year of the breach that gives rise to the termination of this agreement.

14.    This is the Complete Agreement.    This agreement has been entered into by both sides freely, knowingly, and voluntarily, and it incorporates the complete understanding between the parties.  No other promises have been made, nor may any

12

additional agreements, understandings or conditions be entered into unless in a writing signed by all parties or on the record in open court.

DONALD A. DAVIS
United States Attorney

_3/24/09_
Date

NILS R. KESSLER
Assistant United States Attorney

I have read this agreement and carefully discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. My attorney has advised me of my rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. No promises or inducements have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. Finally, I am satisfied with the representation of my attorney in this matter.

_3 - 24 - 2009_
Date

CHARLES RICHARD COPPESS
Defendant

I am Charles Richard Coppess' attorney. I have carefully discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible defenses, of the sentencing provisions, and of the consequences of entering into this agreement. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

_3 - 24 - 2009_
Date

CHRISTOPHER GIBBONS, Esq.
Attorney for Defendant

13